# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MELISSA R. MESSENGER**

**CIVIL ACTION**

**VERSUS**

**NO. 18-827-JWD-EWD**

**BOSTON SCIENTIFIC CORPORATION**

## RULING AND ORDER

This matter comes before the Court on *Defendant Boston Scientific Corporation's* ("Defendant" or "Boston Scientific") *Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Rule 12(b)(6)* (Doc. 48). Plaintiff Melissa R. Messenger ("Plaintiff" or "Messenger") opposes the motion. (Doc. 52.) Boston Scientific has filed a reply. (Doc. 53.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is granted.

## I. Relevant Factual Background

### A. Introduction

The relevant factual allegations are taken from Plaintiff's *Second Amended Complaint* (Doc. 47). They are assumed to be true for purposes of this motion. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The factual background is also taken from those exhibits attached to Defendant's motion that "are referred to in the [P]laintiff's complaint and are central to her claim[s]." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000) (citation omitted).

On August 27, 2007, Messenger was hired by Boston Scientific to serve as an Interventional Sales Specialist ("ISS") for its Interventional Cardiology Division in Louisiana.

(*Sec. Am. Compl.* ¶ 3, Doc. 47.)  In 2011, Messenger was promoted to the position of Coronary Sales Representative ("CSR"); and, thereafter, in 2014, she was promoted to the position of Therapy Consultant ("TC"). (*Id.* ¶ 4.)  At all relevant times, Messenger was classified by Boston Scientific as a "Field Based Interventional Sales Representative" ("FBISR"). (*Id.*)

Messenger's duties as an FBISR for Boston Scientific included attending and observing surgical procedures. (*Id.* ¶ 5.)  Plaintiff alleges: "Because X-Rays and other radiological devices were present and/or used during the surgical procedures being attended and/or observed by FBISRs, said [Boston Scientific] employees, including Messenger, would wear heavy lead vests and/or aprons which. . . were intended to protect against the harmful effects of radiation." (*Id.* ¶ 6.)  According to Plaintiff, Boston Scientific's FBISRs, including Messenger, would wear these lead vests and/or aprons for prolonged periods of time, i.e., multiple consecutive hours, while attending and/or observing surgical procedures on behalf of Boston Scientific. (*Id.* ¶ 7.)

Plaintiff alleges that:

In the event that an FBISR had a physical impairment, limitation, or disability that rendered wearing the lead vests and/or aprons too physically strenuous or potentially dangerous, [Boston Scientific] had at its disposal at all relevant times hereto the means to accommodate said physical impairment, limitation, or disability so that the FBISR could attend and/or observe surgical procedures and fulfill his or her employment duties.

(*Id.* ¶ 8.) Specifically, Plaintiff contends that Boston Scientific "had at its disposal at all times relevant hereto lead shields which could be placed in operating rooms and behind which FBISRs could stand or sit while attending and/or observing surgical procedures and performing the essential tasks associated with their positions." (*Id.* ¶ 9.)

Plaintiff further alleges that Boston Scientific "also had at its disposal at all times relevant hereto surgical control rooms in which FBISRs could stand or sit while attending and/or observing

surgical procedures and performing the essential tasks associated with their positions." (*Id.* ¶ 10.) According to Plaintiff, standing and/or sitting behind those lead shields and/or in those surgical control rooms obviated the need for Boston Scientific's FBISRs to wear the cumbersome lead vests and/or aprons while affording employees the same protection against radiation as the vests and/or aprons. (*Id.* ¶ 11.) Consequently, Plaintiff alleges "the FBISRs would be able to attend and/or observe surgical procedures and perform their job duties despite physical impairments, limitations, or disabilities that might preclude wearing the lead vest and/or apron." (*Id.*)

### B. Plaintiff's Health Problems and Leave of Absence

While working as an FBISR for Boston Scientific, Messenger purportedly began experiencing significant back pain. (*Id.* ¶ 12.) Plaintiff alleges that on or about March 20, 2016, she noticed a significant and acute increase in her back pain while working as an FBISR for Boston Scientific. (*Id.* ¶ 13.) Despite the acute increase in her back pain, Messenger returned to work and fulfilled her duties as an FBISR on or about March 21 and 23, 2016. (*Id.* ¶ 14.) Thereafter, Messenger sought medical treatment, as her back pain was not subsiding. (*Id.*)

On March 28, 2016, Messenger's doctor provided her with a five (5) day excuse from work, i.e., March 28 through April 4, 2016, which Plaintiff alleges that she "understood only limited her from wearing a lead vest and/or apron while performing her work duties as an FBISR." (*Id.* ¶ 15.) However, the doctor's note itself states that "[t]he patient should be **excused from: Work for 5 days.**" (Def. Ex. 1, Doc. 48-2 at 2 (emphasis added).) [1]

From March 28 to April 4, 2016, Messenger continued to work on and off throughout the week. (*Sec. Am. Compl.* ¶ 16, Doc. 47.) During that time, Boston Scientific neither requested a

---

[1] This doctor's note is referenced in and incorporated into the operative complaint. (*See Sec. Am. Compl.* ¶ 15.) It is also central to Plaintiff's *Second Amended Complaint* and will thus be considered by the Court. *Collins*, 224 F.3d at 499.

return to work release from Messenger's treating physician nor advised Messenger that she was not permitted to work in light of the doctor's note. (*Id.* ¶ 16.)

On April 7, 2016, Messenger received another work excuse from her doctor; this time for two (2) weeks. (*Id.* ¶ 17.) Again, while Messenger avers in the *Second Amended Complaint* that she believed that the doctor's note "only limited her from wearing a lead vest and/or apron while performing her work duties as an FBISR" (*id.*), the actual note reads as follows:

__X___ **May not return to work**/school on:_____ 04/07/2016 – 04/21/2016

(Def. Ex. 2, Doc. 48-3 at 3 (emphasis added).)[2]

Plaintiff alleges that even with the work limitation imposed by her treating doctor as of March 28, 2016 and April 7, 2016, she was "capable of performing and qualified to perform all essential functions and duties of an FBISR for [Boston Scientific] with the reasonable accommodation of a lead shield(s) and/or a surgical control room" which she alleges Boston Scientific had at its disposal. (*Sec. Am. Compl.* ¶ 18, Doc. 47.)

Nevertheless, after being provided with Plaintiff's April 7, 2016 doctor's note and despite being able to accommodate the restrictions contained therein, Boston Scientific purportedly refused to accommodate Messenger and restricted her from returning to any form of activity or work on behalf of Boston Scientific. (*Id.* ¶ 19.) Messenger alleges that she immediately notified Boston Scientific that she was unaware her doctor's note would be interpreted to limit her from returning to work in any capacity and explained that the sole purpose of the note was to limit her from wearing a lead vest and/or apron while performing her duties as an FBISR. (*Id.* ¶ 20-21.) However, despite allegedly being able to accommodate Plaintiff's physical limitations by providing her with a lead shield and/or surgical control room, Boston Scientific advised Messenger

---

[2] This note is referenced in Plaintiff's *Second Amended Complaint* and central to Plaintiff's claims, so it will be considered by the Court. *See Second Amend. Compl.* ¶ 17; *Collins*, 224 F.3d at 499.

that she would not be permitted to return to work in any capacity unless and/or until she was capable of wearing a lead vest and/or apron or otherwise released to work without restriction. (*Id.* ¶ 22.)

Given Boston Scientific's refusal to accommodate her doctor's restriction, Messenger returned to her doctor on April 7, 2016 and obtained a second note that permitted her to return to work on that same day without restriction. (*See* Def. Ex. 3, Doc. 48-4 at 2.)[3]  On April 8, 2016, Messenger forwarded this revised doctor's note to Boston Scientific. (*Sec. Am. Compl.* ¶ 24, Doc. 47.)  Messenger alleges:

> In the correspondence forwarding her revised doctor's note, [Plaintiff] advised [Boston Scientific] that she was scheduled to attend a surgery on or about April 9, 2016 and that the facility at which she was going to attend said surgery was aware of her physical impairments and/or limitations relating to her back injury and expressly advised that it could accommodate [Plaintiff's] limitations by providing her with a lead shield that would enable her to attend and/or observe the surgical procedure and fulfill her duties as an FBISR.

(*Id.* ¶ 25.)

Plaintiff then had a series of exchanges with Michele DeCoux (the HR Manager), Annick Matherne, and Scott Heuler in response to the receipt of Plaintiff's revised doctor's note. (*See* Def. Ex. 4, Doc. 48-5.)[4]  On April 8, 2016, at 2:03 a.m., Michele DeCoux emailed Messenger thanking her for a "follow-up note" and telling her she had "a few additional questions" before Messenger returned to work. (*Id.* at 5.)  DeCoux concluded the note: "Please do not return to work until we speak on Monday.  I will reach out to Annick and ensure that your accounts are covered Friday and Monday." (*Id.* at 6.)

---

[3] This doctor's note is referenced in and incorporated into the operative complaint. (*See Sec. Am. Compl.* ¶ 23.)  It is also central to Plaintiff's *Second Amended Complaint* and will thus be considered by the Court. *Collins*, 224 F.3d at 499.

[4] These emails are referenced in Plaintiff's *Second Amended Complaint* and central to Plaintiff's claims, so they will be considered by the Court. *See Sec. Amend. Compl.* ¶¶ 24-27; *Collins*, 224 F.3d at 499.

Plaintiff responded at 2:04 a.m. in a lengthy email by first expressing her concern for the situation and said that she could not "show up tomorrow for the 7:30 procedure" for which she "committed months ago". (*Id.* at 4.) Plaintiff then said:

> I was completely unaware the note would limit me from ALL activity, the only reason for the note is due to wearing lead…, which is why I jumped through hoops today to get revised note today that I do not need to wear lead to support a case. My doctor gave me the notes ([M]arch 28th and today) because he knows I wear lead and stand for hours at a time, and I have a back injury, but there is no reason I can't work and my doctor agreed; I had no idea it would limit me from ALL work- I never would have agreed to that or given either of the notes to Annick.

(*Id.*) Plaintiff also said that she had an "identical note" when she first hurt her back on March 28th, and she "was not told this and worked on and off throughout that entire week, as well as, never obtained or provided a Return to Work Note, and was back in the field without any mention of the issues which arose yesterday…this never came up…Why?" (*Id.*) She again said had she known any of this she "would not have agreed to work, or . . . never would have accepted either note[.]"

(*Id.*) Plaintiff stated:

> I just wanted my manager, team, and customers to know why I was not going into the procedure rooms, but rather watching and participating from the control room, sitting down…I did this because I have been sick or out for medical reasons before and encountered lack of sympathy for the limitations those events incurred.

(*Id.*) After expressing concern for her customers and reputation, Plaintiff stated:

> **The lab knows I cannot wear lead and has arranged for me to use a shield.. The lab director and I spoke and I mentioned Annick's communication to me, and her response was come as BSC or come as yourself, but be here…pointing out she doesn't care about what has now become vendor drama and distraction, her concern is that I am there, as promised, to assure equipment succeeds and the patient is safe. PLEASE do not make me do this, any shred of respect these customers have for me will disappear tomorrow..** It is just not right… I will do as I'm instructed, but asking please, don't make me cancel this late in the game when I did what I was told to return to work… sorry I'm so upset. Please respond as soon as you can because I will need to start damage control in 3 hours.. Thanks, Michele..

Melissa

(*Id.* at 5 (emphasis added).)

DeCoux responded at 12:30 p.m.:

Hi Melissa,

I will work with Annick to ensure that James covers these cases.

Please provide me with the dates, times and locations.

Unfortunately I am in Sam Conaway's staff meeting and unavailable.

I look forward to our discussion on Monday.

(Def. Ex. 4, Doc. 48-5 at 3.)

On the same day at 2:07 p.m., Plaintiff responded by expressing her frustration and concern. (*Id.* at 2.) Plaintiff told Annick that they had not spoken in a few days and that she had refused to respond to Plaintiff's emails and texts. (*Id.*) Plaintiff said she was "quite frankly, [being] forced into an involuntary LOA" when she didn't "even have a diagnosis yet and worked and returned to work two weeks [before] without any of the requirements [she was] being told [were] mandatory now[.]" (*Id.*) Plaintiff said she was told she could "return to work when [she] obtain[ed] a return to note letter from [her] doctor-which [she] did" the day before and which she purported to attach. (*Id.*) Plaintiff then said:

> I did not request a LOA or instigate any type of action to begin approval process; in fact, I did not seek any advice, guidance, or recommendations from you or any BSC employee or other manager, etc ....
> I am having a very hard time understanding that since satisfying the return to work note, as stated in your email and this manual, then and only then am I clear back to work- which I did, almost immediately, but am still being told NO and remain unable to return to work, when I am capable of fulfilling the requirements of my job.
> I am very confused why only the second time, the first note didn't limit me from working, or have the same requirements this second one did, but regardless, I

provided a Return to Work, from my physician, and have no interest in a leave ....
In addition, I do not see in these documents where an employee (who is not even
on leave or requested it) is not cleared back to work, when they have been working
the whole time, and show proof of a medical doctor releasing them ... Am I missing
something? PLEASE help me. I am not in a position to take a leave, especially
without a diagnosis or request by me, and have no interest in that unless of an
emergency ... I need clarification on this ASAP please because it just does not make
sense, plus, in all the literature it states you will be guided by your manager (if
requested, which I didn't...) and we have NOT discussed it once ...

(*Id.* at 3.)  Plaintiff closed by expressing her frustration given her dedication to the company and

the response she was receiving. (*Id.*)

Thus, from these emails, Plaintiff alleges:

Nevertheless, [Boston Scientific] maintained its refusal to accommodate
[Plaintiff]'s physical impairment and/or limitations relating to her back injury and
to permit her return to work in any capacity. Indeed, despite being aware that it
could accommodate [Plaintiff's] physical impairment and/or limitations, [Boston
Scientific] sent correspondence to [Plaintiff] on or about April 8, 2016 ordering her
not to return to work.

(*Sec. Am. Compl.* ¶¶ 26, 27, Doc. 47.)

On April 11, 2016, Plaintiff emailed DeCoux to ask about her work status. (Def. Ex. 5,

Doc. 48-6 at 2.)[5] Plaintiff alleges that despite being able to perform all essential functions

associated with her position with reasonable accommodation from Boston Scientific, Boston

Scientific advised her that her only available option was to apply for leave (FMLA) and that her

position would be protected if she were approved for FMLA. (*Sec. Am. Compl.* ¶¶ 28, 29, Doc.

47.)  The correspondence in which DeCoux replied to Plaintiff's email reads in relevant part:

As we discussed based on your doctor's recommendation and the restrictions you
mentioned I recommend you apply for a leave with Aetna.

The duration of the leave can start at 5 days up to when you are able to return.

_____

[5] This email is referenced in Plaintiff's *Second Amended Complaint* and central to Plaintiff's claims, so it will be
considered by the Court. *See Sec. Amend. Compl.* ¶¶ 28, 29; *Collins*, 224 F.3d at 499.

> If approved the FMLA (family medical leave act) provides you job protection. The goal is to improve your health and the intention is not to move you out of the company.

(Def. Ex. 5, Doc. 48-6 at 2.) Believing based on Boston Scientific's representation that her only option was to apply for leave, Messenger applied for FMLA in April 2016 which was administered through Aetna. (*Sec. Am. Compl.* ¶ 30, Doc. 47.)

Although Messenger applied for leave, "she was at all times material hereto physically capable of performing and/or qualified to perform all essential functions and duties of an FBISR with reasonable accommodation from [Boston Scientific]." (*Id.* ¶ 31.) However, Boston Scientific refused said accommodation. (*Id.*)

On or about May 27, 2016, Messenger's treating doctor placed work restrictions, which she alleges, if reasonably accommodated by Boston Scientific, did not prevent her from performing her duties as an FBISR. (*Id.* ¶ 32.) Specifically, Messenger's "treating doctor provided that [she] could tolerate periods of standing of up to one (1) hour with breaks of ten (10) to fifteen (15) minutes during which she could either sit and/or change positions before standing again." (*Id.* ¶ 33.) Plaintiff contends that Boston Scientific was aware of the foregoing restrictions in May 2016. (*Id.*)

Messenger alleges that she "was capable of performing the essential functions and duties of an FBISR while remaining within the work restrictions placed upon her by her treating doctor, with the reasonable accommodation of the lead shields and/or surgical control rooms at [Boston Scientific's] disposal, as she could sit and/or stand behind the shields and/or in the control rooms while attending and/or observing surgical procedures." (*Id.* ¶ 34.) According to Plaintiff, even though in May 2016 it was, without undue burden or hardship, capable of providing her with a

lead shield and/or a surgical control room that would accommodate her work restrictions and physical impairments and/or limitations, Boston Scientific refused to do so. (*Id.* ¶ 35.)

On June 21, 2016, Messenger again expressed her desire to return to work to Boston Scientific. (*Id.* ¶ 36.) Plaintiff alleges as of June 21, 2016, she was capable of performing and qualified to perform all essential functions and duties of an FBISR with reasonable accommodation from Boston Scientific. (*Id.* ¶ 37.) Specifically, Messenger "was capable of performing her job duties as an FBISR so long as [Boston Scientific] provided her with the reasonable accommodation of the lead shield(s) and/or surgical control room(s) at its disposal." (*Id.* ¶ 38.) Plaintiff further alleges that despite her attempt to return to work in June 2016, Boston Scientific did not contact her regarding her request to return to work nor did it offer to accommodate her physical impairments and/or limitations with the assets at its disposal. (*Id.* ¶ 39.)

In September 2016, Messenger again contacted Boston Scientific regarding her job status. (*Id.* ¶ 40.) As of September 2016, Plaintiff contends that she remained capable of performing and qualified to perform all essential functions and duties of an FBISR with reasonable accommodation from Boston Scientific. (*Id.* ¶ 41.) Specifically, Messenger "was capable of fulfilling her job duties as an FBISR so long [Boston Scientific] provided her with the lead shield(s) and/or surgical control room(s) at its disposal." (*Id.* ¶ 42.)

On September 27, 2016, Boston Scientific advised Messenger that, as a result of failing to provide an anticipated return to work date, it was unclear whether she would be able to return to work at Boston Scientific in the future. (*Id.* ¶ 43.) More specifically, Scott Heuler wrote a letter to Plaintiff stating:

> You have been out of work since April 4, 2016. You have exhausted your available leave under the Family and Medical Leave Act (FMLA) and are in the process for applying for Long-Term Disability (LTD) benefits. At this time, we have not been provided an anticipated return to work date and it is unclear when you will be able

to return to work in the future. In order to meet ongoing business needs, the Company cannot hold your position open. If you become able to return to work, we will endeavor to place you in a comparable position within the Company for which you are qualified.

(Def. Ex. 6, Doc. 48-7 at 2.)[6]

On September 30, 2016, Boston Scientific further advised Messenger that she remained employed by Boston Scientific; however, her future role would depend on a return to work date. (*Sec. Am. Compl.* ¶ 44, Doc. 47.) In other words, according to Plaintiff, instead of accommodating her physical impairments and/or limitations with the assets readily available to it so that she could return to work as an FBISR, Boston Scientific refused to accommodate her and prohibited her return to work. (*Id.* ¶ 45.)

On February 7, 2017, Messenger emailed Boston Scientific, again asking for an update on her employment status. (Def. Ex. 7, Doc. 48-8.)[7] As of early 2017, Plaintiff asserts that she remained capable of performing and qualified to perform all essential functions and/or duties of an FBISR with reasonable accommodation from Boston Scientific. (*Id.* ¶ 47.) Specifically, Plaintiff "was capable of fulfilling her job duties as an FBISR so long as [Boston Scientific] provided her with the lead shield(s) and/or surgical control room(s) at its disposal." (*Id.* ¶ 48.)

On February 8, 2017, Michele DeCoux (the HR Manager) responded by advising Messenger that she was "still an employee of [Boston Scientific] with a leave status" and that Boston Scientific would consider her "employment status once [she has] been out on leave for twelve (12) months- April 2017." (Def. Ex. 7, Doc. 48-8 at 2.) On February 14, 2017, DeCoux further advised Plaintiff that "if [she is] not able to return to work after being out on leave for 12

---

[6] This letter is referenced in and incorporated into the operative complaint. (*See Sec. Am. Compl.* ¶ 43.) It is also central to Plaintiff's *Second Amended Complaint* and will thus be considered. *Collins*, 224 F.3d at 499.

[7] These emails are referenced in Plaintiff's *Second Amended Complaint* and central to Plaintiff's claims, so it will be considered by the Court. *See Sec. Amend. Compl.* ¶¶ 46, 49; *Collins*, 224 F.3d at 499.

months [they] can start to discuss if/when [Plaintiff] may be able to return or look at exiting the company." (Def. Ex. 7, Doc. 48-8 at 3.)

Thus, from this conversation, Plaintiff alleges that instead of accommodating her physical impairments and/or limitations with readily available assets so that she could return to work as an FBISR, Boston Scientific continued its pattern and/or practice of refusing to accommodate her and advised her that she must remain on leave. (*Sec. Am. Compl.* ¶ 50, Doc. 47.)

### C. Plaintiff's Termination

On March 21, 2017, Messenger emailed DeCoux to notify her that she was scheduled for a spine surgery on March 30, 2017, and that she would require six (6) to eight (8) weeks of post-operative convalescence before commencing physical therapy and advised that it was unclear if or when she would be able to return to work. (Def. Ex. 8, Doc. 48-9 at 2.)[8] Plaintiff's email reads in relevant part:

> My surgery is next Thursday March 30th at Ochsner in New Orleans.
> Facts/what I was told by surgeon yesterday:
> I will be seen post-op 2-3 weeks following procedure on March 30. Guessing by mid-April
> **I can not do anytng (sic) during that period including drive/ride in vehicle, along with the  usual no working, lifting, exercise, etc etc same limitations as all year**
> Depending on my post op healing determined by surgeon in follow up appointment, my physical therapy start date will be provided
> Physical therapy is 8-12 weeks for average patients. . . - physical therapy counselor can give better recovery estimate according to surgeon
> **Surgeon still says questions about my future are "arbitrary" and can't be accurately answered. Back injuries depend on patient response to surgery, treatment plan, PT, etc and difficult to provide timeline.**
> Thx. M

(Def. Ex. 8, Doc. 48-9 at 2 (emphasis added).)

---

[8] This email is referenced in Plaintiff's *Second Amended Complaint* and central to Plaintiff's claims, so it will be considered by the Court. *See Sec. Amend. Compl.* ¶ 51; *Collins*, 224 F.3d at 499.

According to Plaintiff, after her surgery, she could perform and was qualified to perform all essential functions and/or duties of an FBISR with reasonable accommodation from Boston Scientific. (*Id.* ¶ 52.) That is, Messenger, "following her surgery, was capable of performing her job duties as an FBISR so long as [Boston Scientific] provided her with the lead shield(s) and/or surgical control room(s) at its disposal." (*Id.* ¶ 53.)

On April 28, 2017, DeCoux sent Messenger a letter warning her that her employment with Boston Scientific would be terminated within fifteen (15) days if she was unable to return to work. (*Id.* ¶ 54.) The letter stated the following:

> The most recent medical information available indicates that you are unable [to] return to work now or in the foreseeable future. We are in the process of reviewing your employment status and are contacting you to confirm this information.
>
> If you are unable to return to work within the next fifteen (15) days, your employment will be terminated effective May 15, 2017. If, however, you believe this information is inaccurate and wish to pursue the possibility of reinstatement, please contact me at [phone number] as soon as possible to discuss and, in any event, no later than May 15, 2017.
>
> If you would like to be considered for reinstatement, we will need to receive updated medical information from your health care provider(s) supporting that you are able to return to work. Boston Scientific reserves the right to verify the updated information provided by your health care provider(s), including through a health care professional of Boston Scientific's choosing as it deems appropriate.
>
> If you are unable to work at this time, you will continue receiving any disability benefits for which you are eligible. Please contact me at [phone number] if you have questions regarding this information. If you have questions in regards to benefits, the HR Service Center can be reached at [phone number].

(Def. Ex. 9, Doc. 48-10.)[9]

---

[9] This letter is referenced in and incorporated into the operative complaint. (*See Sec. Am. Compl.* ¶ 54.) It is also central to Plaintiff's *Second Amended Complaint* and will thus be considered. *Collins*, 224 F.3d at 499.

Based on this letter, Plaintiff alleges that Boston Scientific "did not (1) agree that it would accommodate [Plaintiff's] physical impairments and/or limitations with the assets at its disposal so that she could return to work as an FBISR; (2) offer [Plaintiff] an alternate position which might accommodate her physical impairments and/or limitations; nor did it (3) offer to extend [Plaintiff's] leave period in light of the fact that she was only four (4) weeks into her post-operative convalescence period." (*Id.* ¶ 55.)

On May 8, 2017, Messenger sent an email to DeCoux and Matherne to inquire whether Boston Scientific would permit her to return to work with physical limitations. (*Id.* ¶ 56.) That email states in relevant part:

> Thanks Michele. Can you please help me understand a few scenarios…?
> **1. If my doctor says I can work, but not able to do all on TC checklist (such as wear lead and lift heavy equipment), but can work in some contributing, capacity is return to work with limitations still an option prior to May 15? What happens at this point, to me, my position at [Boston Scientific] exactly if hypothetically my doctor says this…**
> **2. Since my position has been back filled in Jacksonville, what happens if my doctor says I can return with limitations…what happens in that scenario, location-wise, where would [Boston Scientific] put me, Florida or Louisiana?**
> 3. Can I apply for other [Boston Scientific] jobs, if my doctor says I am capable, prior to being "terminated" May 15 so that I am still classified as an "internal" [Boston Scientific] candidate?
> 4. Are there any [Boston Scientific] positions in IC or ANY divisions, located in Louisiana?
> 5. Is national Close the Gap position still an option for me…was headcount approved for 2017?
> 6. If I am "terminated" May 15, do you just send me a letter like the one I received or is there a formal process that will take place? I don't know or understand what Severance packages are, I've never been terminated from a company…so please pardon my ignorance of asking, but I hear about these when employees are non-fault terminated and RIFs occur.
> **7. Do you recommend I seek legal counsel since as I mentioned it on last call when I struggled to understand all of this process? On our call you didn't respond to me asking, but I'm very confused and extremely concerned about separating from the company due to only not being able to wear lead when lead shields are provided at all facilities…?**

(Def. Ex. 10, Doc. 48-11 at 2 (emphasis added).) [10]

As of May 8, 2017, Messenger alleges that she was capable of performing and qualified to perform all essential functions and/or duties of an FBISR with reasonable accommodation from Boston Scientific. (*Id.* ¶ 57.) Specifically, Messenger "was capable of performing her job duties as an FBISR so long as [Boston Scientific] accommodated her by providing the lead shield(s) and/or surgical control room(s) at its disposal." (*Id.* ¶ 58.)

Messenger further inquired whether Boston Scientific would consider letting her return to work in any other position that may accommodate her physical impairments and/or limitations. (*Id.* ¶ 59.) Ultimately, "despite [Plaintiff's] pleas to return to work and [Boston Scientific's] ability to accommodate [Plaintiff's] physical impairments and/or limitations so that she could return to work, [Boston Scientific] terminated [Plaintiff's] employment on May 15, 2017." (*Id.* ¶ 60.)

Additionally, Plaintiff alleges that when she was first employed by Boston Scientific, Boston Scientific's job description for FBISRs did not include physical requirements. (*Id.* ¶ 61.) Plaintiff claims to have notified Boston Scientific that its FBISR job description contained no physical requirement; and, therefore, she should be permitted to return to work. (*Id.* ¶ 62.) But according to Plaintiff, in response to this notification, Boston Scientific "re-drafted its FBISR job description to include a physical requirement." (*Id.* ¶ 63.) Plaintiff further alleges that Boston Scientific "re-drafted its FBISR job description (1) on account of [her] physical impairment and/or limitations and (2) in order to screen [her] out of eligibility for employment as an FBISR and employment in any alternate position with [Boston Scientific]." (*Id.* ¶ 64.)

---

[10] As with the other documents attached to Defendant's motion, this email was referenced in Plaintiff's *Second Amended Complaint* and is central to her claims. *See Sec. Am. Compl.* ¶¶ 54, 55, Doc. 47; *Collins*, 224 F.3d at 499.

### D.  Procedural History and Plaintiff's Claims

On March 9, 2018, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that Boston Scientific unlawfully discriminated against her on account of an actual and/or perceived physical impairment. (*See* Def. Ex. 11, Doc. 48-12 at 9.)[11] The EEOC thereafter issued a "Right to Sue" letter to Plaintiff on April 11, 2018. (*Sec. Am. Compl.* ¶ 66, Doc. 47.)  Thereafter, on April 27, 2018, Messenger filed the present lawsuit. (*Id.* ¶ 67; *Pet. for Damages*, Doc. 1-1 at 3.)  Plaintiff removed the action on September 7, 2018. (*Notice of Removal*, Doc. 1.)

In the *Second Amended Complaint*, Plaintiff asserts Boston Scientific's pattern, practice, and/or policy of discriminatory and adverse employment decisions relative to her, which were made specifically on account of her actual and/or perceived physical impairment, include, the following:

a.  Boston Scientific continuously prohibited Messenger from returning to work as an FBISR; a position for which she was otherwise qualified with reasonable accommodation from Boston Scientific;

b.  Boston Scientific continuously refused to provide Messenger reasonable accommodations at its disposal so that she could return to work as an FBISR, a position for which Messenger was otherwise qualified;

c.  Boston Scientific continuously denied Messenger alternate employment opportunities with Boston Scientific by ignoring Messenger's requests to be considered for alternate positions within the company, the essential functions of which she was also capable of performing and otherwise qualified to perform with reasonable accommodation by Boston Scientific;

d.  Boston Scientific amended its written job description for FBISR to include physical requirements that previously did not exist in order to screen Messenger out of eligibility for the FBISR position;

---

[11] Again, as with the other documents attached to Defendant's motion, the EEOC Charge was referenced in Plaintiff's *Second Amended Complaint* and is central to her claims. *See Sec. Am. Compl.* ¶ 65, Doc. 47; *Collins*, 224 F.3d at 499.

And while Plaintiff alleges that the Charge was filed on February 24, 2018 in her *Second Amended Complaint*, that is not accurate. The EEOC Charge is dated February 24, 2018; however, it was not received by (and therefore not filed with) the EEOC until March 9, 2018.

e.  Boston Scientific terminated Messenger on or about May 15, 2017; and

f.  Any other discriminatory and/or adverse act which may be proven at the trial of this matter.

(*Sec. Am. Compl.* ¶¶ 85, 103, Doc. 47.)

Plaintiff brings her claims under (1) The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (2) The Louisiana Employment Discrimination Law, La. Rev. Stat. Ann. § 23:301 *et seq.*; and (3) Vicarious liability. (*Sec. Am. Compl.* ¶¶ 68-109, Doc. 47.) Plaintiff seeks a variety of damages, including past wages, future wages, non-pecuniary damages, punitive damages, and attorney's fees. (*Id.* ¶ 110.)

## II.  Relevant Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified,

drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

## III.   Discussion

### A.  Parties' Arguments

#### 1. Defendant's Memorandum in Support (Doc. 48-1)

Defendant moves to dismiss three claims: (1) discriminatory discharge based on an actual or perceived disability in violation of the ADA and LEDL; (2) failure to make reasonable accommodations in violation of the ADA and LEDL; and (3) vicarious liability.

With respect to the ADA and LEDL claims, Defendant first argues that most of Plaintiff's claims are time-barred. As to the remaining claims, Defendant contends that Plaintiff was not a "qualified individual with a disability" under the ADA. That is, she was not able to perform the essential functions of the job despite her disability or show that a reasonable accommodation

would enable her to perform the essential functions of the job. Plaintiff advised Defendants during her period of long-term disability that she could not work, and she did not provide any medical updates about if/when she could return to work. Defendant relies on Fifth Circuit case law where plaintiffs' ADA claims were dismissed because they were not medically cleared to work therefore not considered a "qualified individual with a disability" under the ADA. Further, Defendant asserts that the accommodation Plaintiff suggested (indefinite leave) was not a reasonable accommodation as a matter of law. Lastly, Defendant argues that the vicarious liability claim fails because Plaintiff has not pled a tort nor made any allegations of tortious conduct.

## 2. Plaintiff's Opposition (Doc. 52)

Plaintiff responds that her ADA and LEDL claims are not time-barred under the continuing violation doctrine because there was a continuing pattern or policy of numerous identical, similar, or related adverse employment decisions on account of her actual or perceived limitations. She alleges that the discrimination began in April 2016 and continued until her termination in May 2017. During that time, Plaintiff asserts she was qualified at all times and could perform the essential functions of her job with a reasonable accommodation of a lead shield and/or surgical control room. Plaintiff then urges that the Court consider only the four corners of the amended complaint and not Defendant's other exhibits.

As to the qualification issue, Plaintiff asserts that Defendant had lead shields and/or surgical control rooms available that Plaintiff could have used and that would have eliminated the need for lead vests and aprons. As to the continuous pattern or policy of discrimination, Plaintiff maintains that: (1) she was continually denied the opportunity to work, (2) continuously denied reasonable accommodations, (3) continually denied alternate working opportunities, (4) Defendant amended the job description to have certain physical requirements Plaintiff could not meet, and

(5) Plaintiff was terminated. To the time-barred claim, Plaintiff relies on the continuing violation doctrine and cites the above actions taken by Defendant to show why her claims remain actionable. Plaintiff again urges that Defendant's exhibits should not be considered but argues that, if they are, they require further discovery. Plaintiff then argues that the exhibits, particularly the April 28, 2017 letter and the May 8, 2017 email, raise certain questions that are best left for the summary judgment phase. Plaintiff also contends that she was not seeking "indefinite leave," but rather was entitled to the reasonable accommodation of lead shields and/or surgical control rooms that were at Defendant's disposal. Lastly, Plaintiff argues her claim for vicarious liability lies with the ADA, and therefore it is cognizable.

### 3. Defendant's Reply (Doc. 53)

Defendant responds:

> The law is clear that based on these facts, Messenger was not a "qualified individual with a disability" at the time of her discharge and that Boston Scientific Corporation ("BSC") was well within its legal rights to terminate her employment when she remained medically unable to return to work for more than one year and could not identify when she might be cleared to return to work, if ever.

(Doc. 53 at 2.) First, Defendant argues that the Court must consider documents referenced in the *Second Amended Complaint* and central to Plaintiff's claims, so the Court should reject Plaintiff's effort to ignore these documents. Second, Defendant contends these documents directly contradict the conclusory allegations made in Plaintiff's complaint regarding the availability of the accommodations. Rather, the doctor's notes show that Plaintiff submitted two notes requiring that she be "out of work"; that Plaintiff went on short term disability leave; that she went on long term disability leave and was unable to provide Defendant with her anticipated return date; and that she sent an email shortly before termination saying that she could not work for six to eight weeks and she could not answer questions on when she could return to work. Third, according to Defendant,

the Fifth Circuit cases are not distinguishable; while they involved summary judgment, they show that, as a matter of law, an employee who is physically unable to return to work because of a medical condition is not a "qualified individual" under the ADA or LEDL.  Fourth, Defendant asserts that the continuing violation doctrine fails because (a) Messenger's claims involve different types of discrimination (disability discrimination v. failure to accommodate); (b) the events are infrequent, as Defendant accommodated Plaintiff for a year before terminating her; and (c) the events are separated by several intervening events, including Plaintiff's long-term disability, her back surgery, and her saying that she could not return to work.  Lastly, Defendant argues that Plaintiff cannot recover for vicarious liability independent of her ADA and LEDL claims.

### B.  ADA and LEDL Claims

#### 1. Prescription

Preliminary, the Court agrees with Defendant that many of Plaintiff's ADA and LEDL claims are time-barred.  Under the ADA, "a plaintiff must file a charge of discrimination within 300 days of the alleged discriminatory act." *Harrison v. Estes Express Lines*, 211 F. App'x 261, 264 (5th Cir. 2006) (per curiam) (citing 42 U.S.C. § 2000e-5(e)(1)); *see also Nabors v. Metro. Life Ins. Co.*, No. 12-827, 2012 WL 2457694, at *2–3 (W.D. La. May 30, 2012), *report and recommendation adopted*, No. 12-827, 2012 WL 2427169 (W.D. La. June 26, 2012).

Here, Plaintiff filed her EEOC charge on March 9, 2018. (*See* Def. Ex. 11, Doc. 48-12 at 9.)[12] Thus, any act of disability discrimination occurring before May 13, 2017, (300 days before her EEOC charge was filed) is time-barred under the ADA.  This is all of Defendant's alleged misconduct, other than the May 15, 2017, termination.

---

[12] Again, while Plaintiff alleges that the Charge was filed on February 24, 2018 in her *Second Amended Complaint*, it was not received by (and therefore not filed with) the EEOC until March 9, 2018.

Similarly, the LEDL has a one-year prescriptive period. La. Rev. Stat. 23:303(D); *Bellow v. Bd. of Sup'rs of Louisiana State Univ. & Agr. & Mech. Coll.*, 913 F. Supp. 2d 279, 289 (E.D. La. 2012), *aff'd in part sub nom. Bellow v. LeBlanc*, 550 F. App'x 181 (5th Cir. 2013); *Nabors*, 2012 WL 2457694, at *3 (citing La. R.S. 23:303(D)). This period "begins to run on the date that the discrimination occurs." *Nabors*, 2012 WL 2457694, at *3; *see also Bellow*, 913 F. Supp. at 289 ("Prescription under the statute commences on the day that the termination occurred."). "[T]his one-year period shall be suspended during the pendency of any administrative review or investigation of the claim conducted by the federal Equal Employment Opportunity Commission or the Louisiana Commission on Human Rights." La. Rev. Stat. 23:303(D). "No suspension authorized pursuant to this Subsection of this one-year prescriptive period shall last longer than six months." *Id.* "Therefore, the total amount of time that a plaintiff has to bring a claim under Louisiana Revised Statute 23:322 is eighteen months." *Bellow*, 913 F. Supp. 2d at 289; *see also Nabors*, 2012 WL 2457694, at *3 ("Consequently, the LEDL requires a plaintiff to file suit on his discrimination claim no later than eighteen months after the occurrence forming the basis for the claim." (citations omitted)).

"Under Louisiana law, prescription statutes are strictly construed against prescription and in favor of the claim sought to be extinguished; thus, a construction that favors maintaining an action rather than barring it should usually be adopted." *Nabors*, 2012 WL 2457694, at *4 (citations and quotations omitted). "Ordinarily, the burden of proof is on the party pleading prescription; however, when the plaintiff's petition has clearly prescribed on its face, as here, the burden shifts to the plaintiff to prove that prescription has been suspended or interrupted." *Id.* (citations and quotations omitted).

Again, Plaintiff allegedly filed her EEOC complaint on March 9, 2018 (Def. Ex. 11, Doc. 48-12 at 9), and she filed suit on April 27, 2018 (*Pet. for Damages*, Doc. 1-1 at 3). Thus, the time between these two dates (which does not exceed six months) is excluded. *See* La. Rev. Stat. 23:303(D). Thus, all acts occurring before March 9, 2017 (one year before the EEOC charge was filed, which is, again, essentially all acts other than her termination) are time-barred under the LEDL. Since the *Second Amended Complaint* is prescribed on its face, Plaintiff had the burden of proving that any such claims were not prescribed, and she has failed to do so.

## 2. Continuing Violation Doctrine

Again, under the ADA, "a plaintiff must file a charge of discrimination within 300 days of the alleged discriminatory act." *Harrison*, 211 F. App'x at 264. Because Plaintiff's EEOC charge was filed on March 9, 2018 (Def. Ex. 11, Doc. 48-12 at 9), any claim of disability discrimination or failure to accommodate occurring before May 13, 2017, (300 days before her EEOC charge was filed) would be time-barred. To save these claims, Plaintiff would have to use the continuing violation doctrine and argue that her termination keeps these claims from being prescribed. But this argument fails for several reasons.

"Under the continuing violation doctrine, a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Henson v. Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 391 (5th Cir. 2005) (per curiam) (citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)). "The Supreme Court has clarified, however, that discrete discriminatory acts are not actionable if time barred, even when they are related to acts complained of in timely filed charges." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). Further, as the Eastern District has explained:

There are several limits on the applicability of the continuing violations doctrine, including

> (1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."

*Notariano v. Tangipahoa Par. Sch. Bd.*, 266 F. Supp. 3d 919, 924 (E.D. La. 2017), *reconsideration denied*, No. CV 16-17832, 2018 WL 1172959 (E.D. La. Mar. 6, 2018) (quoting *Heath v. Bd. of Supervisors for the Southern Univ.*, 850 F.3d 731, 738 (5th Cir. 2017), *as revised* (Mar. 13, 2017)).

Here, the Court finds that the continuing violation doctrine is inapplicable to most of Plaintiff's claims. First, even if the actions were related, Plaintiff alleges the kind of discrete acts which are not contemplated by the continuing violation doctrine. *See Henson*, 128 F. App'x at 391 (finding that alleged failures to accommodate were "discrete acts" that "do not qualify under the continuing violation exception to the ADA's actionable period restrictions"); *Gerald v. Univ. of S. Miss.*, No. 12-147, 2014 WL 172113, at *8 & n.4 (S.D. Miss. Jan. 15, 2014) (stating, "The Fifth Circuit has held that the failure to accommodate a disability constitutes a discrete act that must be timely brought before the EEOC in order for a claimant to obtain relief under the ADA," (citing *Henson*, 128 F. App'x at 391), and noting that "numerous other federal authorities are in accord." (citations omitted)); *Fraga v. Alamo Cmty. Coll. Dist.*, No. 07-930, 2009 WL 10699730, at *2 (W.D. Tex. Nov. 10, 2009) ("Here, Fraga's allegations all arise from discrete acts — his March 2006 job transfer and the District's alleged failure to accommodate his walking impairment following this transfer. These discrete acts are not properly characterized as a 'continuing violation.' [*Henson*, 128 F. App'x. at 391]. Accordingly, Fraga's claims arising from his March 2006 job transfer are time-barred."); *see also Detrick v. H & E Mach., Inc.*, 934 F. Supp. 63, 68

(W.D.N.Y. 1996) ("I reject [plaintiff's] argument that her 'termination should be considered the final and culminating act in the chain of hostile acts which created the "hostile workplace" ' . . . '[I]f every termination were considered the final act in a series of hostile acts, no hostile workplace claim in which the plaintiff was also terminated would ever be time-barred.' " (citing *White v. Arab Banking Corp.*, 1996 WL 191727 (S.D.N.Y. 1996)).

Second, the Court agrees with Defendants that there are several intervening events which separate the timely event (termination) from the other events. These include the Plaintiff's back surgery (March 30, 2017) and her March 21, 2017, email stating that she could not return to work. (Def. Ex. 8, Doc. 48-9 at 2.) For these reasons, the Court will focus solely on the Plaintiff's termination for her ADA and LEDL claims.

### 3. Relevant Standard

" 'The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability," by, among other things, terminating an individual's employment.' " *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (quoting *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016) (alteration in original) (quoting 42 U.S.C. § 12112(a))). " 'To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability.' " *Id.* (quoting *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (alteration in original)).

"The ADA also 'requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . ." ' " *Id.* (quoting *Delaval*, 824 F.3d at 481 (quoting 42 U.S.C. § 12112(b)(5)(A))). "To prevail on a failure-to-accommodate claim, the plaintiff must show '(1) [he] is a "qualified individual with a

disability;" (2) the disability and its consequential limitations were "known" by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.' " *Id.* (quoting *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

Additionally, "the Louisiana Employment Discrimination statute is essentially patterned after the ADA[.]" *Mincey v. Dow Chem. Co.*, 217 F. Supp. 2d 737, 742 (M.D. La. 2002). Consequently, "the result of this Court's analysis under either statute must, necessarily, be the same." *Id.*

Thus, for both types of ADA claims and for claims under the LEDL, Plaintiff must demonstrate that she was "qualified." "A plaintiff can establish that he is 'qualified' by showing that 'either (1) [he] could perform the essential functions of the job in spite of [his] disability,' or '(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job.' " *Moss*, 851 F.3d at 417–18 (quoting *LHC Grp.*, 773 F.3d at 697).

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).[13]

---

[13] Under the ADA's implementing regulations:

> (2) A job function may be considered essential for any of several reasons, including but not limited to the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2). The regulations further provide:

Under the ADA, "[t]he term 'reasonable accommodation' may include—"

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Under the ADA's implementing regulations, the term "reasonable accommodation" is defined as:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

Case law provides further guidance on reasonable accommodations. " 'The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation.' " *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *E.E.O.C. v. Agro Distrib.*,

---

Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Id.* § 1630.2(n)(3).

555 F.3d 462, 471 (5th Cir. 2009)). Again, "reassignment to a different job may be a reasonable accommodation, but '[t]he plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform.' " *Moss*, 851 F.3d at 418 (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)); *see also Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("For the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant."). Critical to this ruling, " '[t]ime off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave.' " *Moss*, 851 F.3d at 418 (quoting *Delaval*, 824 F.3d at 481). The question is not whether an employee is qualified for her job before taking leave; "instead the question is whether [she is] qualified at the time of [her] termination." *See id.* (citing *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012)).

### 4. Analysis

The sole question presented by this motion is whether, when construing the allegations of the *Second Amended Complaint* and Defendant's exhibits in a light most favorable to Plaintiff, there were "any available reasonable accommodations that would have enabled [Plaintiff] to perform the essential functions of [her] job." *Moss*, 851 F.3d at 419. That is, on the facts alleged, was Plaintiff qualified for her job under the ADA at the time of her termination? In short, the Court finds that she was not.

The Court believes that this motion turns on Plaintiff's March 21, 2017, and May 8, 2017, emails. (Def. Ex. 8, Doc. 48-9 at 2; Def. Ex. 10, Doc. 48-11 at 2.) Again, in the first email, when Plaintiff informs Defendant of her surgery, she specifically states that, during her post-op period: "I can not do anytng (sic) during that period including drive/ride in vehicle, along with the usual

no working, lifting, exercise, etc etc same limitations as all year[.]" (Def. Ex. 8, Doc. 48-9 at 2.) After discussing her 8-12 weeks of physical therapy, she said: "Surgeon still says questions about my future are 'arbitrary' and can't be accurately answered. Back injuries depend on patient response to surgery, treatment plan, PT, etc and difficult to provide timeline." (*Id.*) Following Defendant's email that she must return to work or face termination, Plaintiff responded (in relevant part):

> 1. If my doctor says I can work, but not able to do all on TC checklist (such as wear lead and lift heavy equipment), but can work in some contributing, capacity is return to work with limitations still an option prior to May 15? What happens at this point, to me, my position at [Boston Scientific] exactly if hypothetically my doctor says this…
> 2. Since my position has been back filled in Jacksonville, what happens if my doctor says I can return with limitations…what happens in that scenario, location-wise, where would [Boston Scientific] put me, Florida or Louisiana?
> . . .
> 7. Do you recommend I seek legal counsel since as I mentioned it on last call when I struggled to understand all of this process? On our call you didn't respond to me asking, but I'm very confused and extremely concerned about separating from the company due to only not being able to wear lead when lead shields are provided at all facilities…?

(Def. Ex. 10, Doc. 48-11 at 2.)

Reading these emails together and apart from the conclusory allegations of the *Second Amended Complaint*, the Court finds that Defendant has the stronger position. Even construing the facts in a light most favorable to the Plaintiff, she is essentially requesting *two* accommodations: the shield *and* an indefinite period of leave so that she could get to the point of using it. Again, " '[t]ime off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave.' " *Moss*, 851 F.3d at 418 (quoting *Delaval*, 824 F.3d at 481). Plaintiff's March 21, 2017 email clearly states that no prediction could

be made for her recovery, and her May 8, 2017 email only speaks of returning to work in hypotheticals.

Without more, Plaintiff has failed to allege that there was a reasonable accommodation that would allow her to return work at the present, at a specified date, or in the immediate future; consequently, she was not qualified for her job under the ADA. *See Moss*, 851 F.3d at 419 ("Although taking leave that is limited in duration may be a reasonable accommodation to enable an employee to perform the essential functions of the job upon return, taking leave without a specified date to return or, in this case, with the intent of never returning is not a reasonable accommodation." (citing *Delaval*, 824 F.3d at 481; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759–60 (5th Cir. 1996) ("[R]easonable accommodation is by its terms . . . that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question. . . . [R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected" (emphasis omitted) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)))); *Crews v. Dow Chem. Co.*, 287 F. App'x 410, 412 (5th Cir. 2008) (per curiam) (finding that plaintiff was "not a 'qualified individual with a disability under the ADA' because "[a]ccording to her own physician, [plaintiff] cannot return to work in the foreseeable future. Thus, [plaintiff] cannot perform the essential functions of her job, with or without reasonable accommodation."); *Mincey*, 217 F. Supp. 2d at 743 ("the Court finds that plaintiff's inability to report to work on a regular basis rendered her unable to perform the essential functions of her position and, therefore, that she was not a qualified individual under the ADA"). Accordingly, Plaintiff's non-prescribed ADA and LEDL claims must be dismissed.

### C. Vicarious Liability

In short, Plaintiff has no independent claim for vicarious liability under state or federal law. Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes. *E.g., Nichols v. Lewis Grocer*, 138 F.3d 563, 566 (5th Cir. 1998); *Fishel v. Farley*, No. 93–480, 1994 WL 90325, at *2 (E.D. La. Mar. 16, 1994); *King v. Phelps Dunbar, L.L.P.,* 743 So.2d 181, 187 (La. 1999). Under Title VII, an "employer" includes any "person engaged in an industry affecting commerce . . . and any agent of such a person." 42 U.S.C. § 2000e(b). This circuit has held that there is no individual liability for employees under Title VII. *See Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir. 1999); *Grant v. Lone Star Co.,* 21 F.3d 649, 652 (5th Cir. 1994). While Title VII's definition of the term employer includes "any agent" of an employer, Congress's purpose was merely to import *respondeat superior* liability into Title VII. *See Indest*, 164 F.3d 258 at 262; *Grant*, 21 F.3d 649 at 652 (citing *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587 (9th Cir. 1993)). The same reasoning applies to the ADA. *See Thompson v. City of Arlington, Tex.*, 838 F. Supp. 1137, 1151 (N.D. Tex. 1993) (dismissing claims against individual defendants because they did not fall under the definition of "employer" under the ADA); *Jenkins v. Bd. of Educ. of Houston Indep. Sch. Dist.*, 937 F. Supp. 608, 613 (S.D. Tex. 1996) ("Applying this rationale [from *Thompson* and *Grant*] to Jenkins's claims against the individual defendants in this case, it is apparent that they may not be held personally liable under the ADA because they do not fall within the statutory definition of an employer.").

Accordingly, there is no claim against individual employees under the ADA. As demonstrated above, Plaintiff's claim for vicarious liability is misguided, as the very purpose of

the ADA and LEDL is to impose liability on employers when their agents and employees engage in discriminatory conduct. Accordingly, Plaintiff's vicarious liability claim is dismissed.

### D. Leave to Amend

Lastly, the Court must address whether it will grant leave to amend the operative complaint to cure the above deficiencies.

Federal Rules of Civil Procedure 15(a) "requires the trial court to grant leave to amend freely," further "the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987, 994 (5th Cir. 2005) (internal citations omitted). However, "[l]eave to amend is in no way automatic, but the district court must possess a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (citing *Jones*, 427 F.3d at 994). The Fifth Circuit further described the district courts' discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." *Jones*, 427 F.3d at 994. (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal*." Mayeaux v. La. Health Serv. & Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." (citation and internal quotation marks omitted).

*Id.*, 751 F.3d at 378.

In addition, the Fifth Circuit has made clear that "denying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Boggs v. Miss.*, 331 F.3d

499, 508 (5th Cir. 2003)). An amendment would be deemed futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.*

Applying this standard, the Court will not allow Plaintiff's an additional amendment. Although Plaintiff did not formally request leave to amend, she has already amended the operative complaint once in response to a motion to dismiss, and as stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor to consider when granting or denying leave to amend, as is undue delay. *Marucci Sports*, 751 F.3d at 378 (citation omitted). The Court finds that these factors weigh in favor of denying leave to amend.

More importantly, however, the Court finds that any amendment would be futile. As discussed above, most of Plaintiff's claims have prescribed as a matter of law, and Boston Scientific's emails conclusively establish that Plaintiff was not qualified to perform the essential functions of her job under the ADA and LEDL at the time of her termination. Further, Plaintiff has no claim under state or federal law for vicarious liability. For these additional reasons, the Court will deny Plaintiff leave to amend and dismiss her claims with prejudice.

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that *Defendant Boston Scientific Corporation's Motion to Dismiss Pursuant to Rule 12(b)(6)* (Doc. 48) is **GRANTED**, and all claims by Plaintiff Melissa R. Messenger against Defendant Boston Scientific are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>January 6, 2020</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**